IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE ESTATE OF JASON IKE PERO,
by Personal Representative Holly Gauthier,

                              OPINION AND ORDER

         Plaintiff,

                                20-cv-984-bbc

     v.

COUNTY OF ASHLAND, and
BROCK MRDJENOVICH,
in his individual capacity,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

On November 8, 2017, Ashland County Deputy Brock Mrdjenovich was dispatched to a residence on the Bad Indian Reservation after a 911 caller said there was a person outside with a knife and the caller had locked himself inside his residence. About three minutes after announcing that he was on the scene, Mrdjenovich fired two gunshots that killed Jason Ike Pero, a 14-year-old boy who lived at the residence. Now Pero's estate brings this action against Mrdjenovich under 42 U.S.C. § 1983, alleging that the deputy violated Pero's constitutional rights under the Fourth Amendment by using objectively unreasonable force against him. (Plaintiff has also sued Ashland County, but only for indemnification purposes in the event liability is found against Mrdjenovich.) Mrdjenovich contends that his use of force was reasonable because Pero came towards him and ultimately lunged at him with a knife despite the deputy's repeated commands to stop and drop the knife.

1

Defendants have moved for summary judgment, dkt. # 37, contending that the material facts are undisputed and plaintiff's claims fail as a matter of law. Defendants have also moved to exclude the opinion of plaintiff's expert, Dr. Larry Blum, a forensic pathologist. Dkt. # 33. (They have also moved to exclude plaintiff's police practices expert, dkt. #53, but it is unnecessary to decide this motion because the limited opinions plaintiff offers from this expert to oppose summary judgment are ultimately irrelevant to the outcome of the motion.) If allowed, Blum's testimony offers a different narrative that suggests that Mrdjenovich's use of deadly force against Pero, particularly the firing of a second shot, was unreasonable. Blum's testimony is important because Mrdjenovich is the only living witness to what happened outside the Pero residence on November 8, 2017, and no video evidence exists that might confirm or contradict Mrdjenovich's account. Accordingly, before considering the motion for summary judgment, I must decide whether Blum's testimony is admissible under the holding in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

Given the critical importance of Blum's testimony to plaintiff's case, I have evaluated his opinions with particular care. Having done so, I find that they are unreliable and therefore inadmissible, for the reasons explained below. What little additional evidence plaintiff has is not enough to permit a jury to find that Mrdjenovich is lying about the circumstances that led to shooting Pero two times on November 8, 2017. Because an objectively reasonable officer faced with the same circumstances would have had probable cause to believe Pero posed an immediate threat to his safety, Mrdjenovich's use of deadly

2

force was reasonable under the Fourth Amendment, and defendants are entitled to summary judgment.

The following facts are undisputed unless otherwise noted.

FACTS

At approximately 11:37 a.m. on November 8, 2017, Ashland County dispatchers received a 911 call from a person who identified himself as Jason Pero.  The caller reported that an unknown male wearing a purple sweatshirt and white pants was walking around outside the Pero residence carrying a knife.  The Pero address was 73374 Maple Street in Odanah, Wisconsin, on the Bad Indian Reservation.  Ashland County dispatched this information to deputy sheriff Brock Mrdjenovich, who was assigned to patrol duty on the reservation.  Mrdjenovich responded "10-4," activated his lights and sirens, and headed towards the address.  Sheriff Michael Brennan, Sergeant Bruce Joanis and Deputy Justin Gilbertson also heard the dispatch, and shortly afterward began to head to the Pero residence from their respective locations.  At 11:41:05 to 11:41:21 a.m., Gilbertson announced that he would be responding to the scene of the subject call from the Ashland County jail, which was 12 miles from 73374 Maple Street.  Mrdjenovich heard this transmission.

While en route to the Pero residence, Mrdjenovich asked dispatch whether the male with the knife had tried to attack anyone or made any threats.  Dispatch replied that it was "unknown," adding that the caller had just seen the person outside walking with a knife in his hand, was unsure whether the subject left or his direction of travel, and that the caller

had locked his door and was staying inside.  At about 11:45 a.m., Joanis, who was on the call, asked dispatch if the caller knew who the male was, to which dispatch responded, "negative. He did not."  Joanis also asked dispatch if the male said anything, to which dispatch replied that it was unknown.

At 11:46 a.m., Mrdjenovich radioed "10-60," announcing that he had arrived on the scene.  As he turned onto Maple Street, he turned off his emergency lights and sirens and slowed his speed to between 5 and 10 miles an hour to begin searching for the person.  As he arrived at the Pero residence, he observed an individual of very large build wearing a purple hooded sweatshirt and white or gray pants.  (According to the autopsy, Pero was 5'7" and 356 pounds, making him morbidly obese, to the point of "super" morbid obesity. Plaintiff suggests that Pero had diminished physical abilities as a result of his condition, but has adduced no evidence to this effect.)  Unbeknownst to Mrdjenovich at the time, this person was 14-year-old Jason Pero, the same person who had called 911.  Pero was standing next to a big rock and a tree in the front yard, with his sweatshirt hood up over his head.

Determining that this person matched the description provided by the 911 caller, Mrdjenovich parked his squad car in front of the residence, with the passenger side facing the front yard, just to the north of the driveway.  A ditch lay between the road where the deputy parked his squad and the front yard of the Pero residence, where Pero was standing. Mrdjenovich opened his door, stepped out of his squad with his left foot on the ground and his right foot still inside, and called: "You over there in the purple, police, stop!" Mrdjenovich was dressed in his full deputy sheriff's uniform, equipped with a baton, an

electric control device (TASER), a tactical flashlight, OC spray (pepper spray), a gun, and two 15-round magazines. As he stepped partway out of his squad, he had his gun drawn and pointed toward the ground near his left thigh.

After Mrdjenovich called out, Pero turned his head and looked towards him, at which point Mrdjenovich noticed a knife with a 6-inch blade in Pero's left hand. To Mrdjenovich's surprise, Pero then began walking briskly towards Mrdjenovich, coming at a rate faster than the deputy would have expected for someone of his large size. Mrdjenovich noticed that Pero was not wearing shoes, despite the cold weather, which suggested to the deputy that something was emotionally or cognitively wrong with him.

As Pero advanced, he continued to hold the knife in his left hand, down by his thigh. Mrdjenovich commanded Pero to "Drop the knife, drop it now!" and "Police, stop!" and repeated these commands several times as Pero came towards him. Pero did not respond or otherwise react to any of Mrdjenovich's commands but continued to advance, walking down into the ditch and up to its crest on the other side, nearest the road. This advance – from the rock in the front yard to the crest of the ditch – took approximately five to ten seconds. When he reached the crest of the ditch, Pero paused for about two to three seconds, at a distance of about 10-12 feet from Mrdjenovich, and stared at the deputy with an emotionless, "1,000 yard stare." Mrdjenovich could see Pero's face and believed him to be 16-18 years old.

When Pero stopped at the crest of the ditch, Mrdjenovich fully exited his squad, turned his body to face him, and raised his gun from the low-ready position to where it was

pointing directly at Pero.  Because backup officers had not yet arrived, Mrdjenovich ruled

out using OC spray, his baton, or a TASER in the event Pero advanced on him with the

knife, because he was trained that he needed to be armed with a weapon superior to a knife

if there was no backup officer with deadly force available.  When Mrdjenovich pointed his

weapon at Pero, Pero started walking towards him again, this time at a slower pace than he

had moved initially.  Pero walked towards the front of Mrdjenovich's squad car, came

around it, and began walking towards the driver's side where Mrdjenovich was standing.

Mrdjenovich continued to command Pero to "drop the  knife, do it now, drop it right now,

drop the knife," but again, Pero did not respond.

When Pero came around the front driver's side bumper of the squad car, he was about

eight feet away from the deputy.  Mrdjenovich began walking backwards to keep a safe

distance, keeping his eyes and gun trained on Pero and continuing to shout commands at

Pero to drop the knife.  When Pero  reached the rear driver's side trunk area, he changed the

position of the knife, so that instead of being down at his thigh, it was up near his hip, in a

horizontal position.  (According to Mrdjenovich, the blade was pointed at him, but plaintiff

says that when Mrdjenovich was asked during his deposition to demonstrate how Pero held

the knife, he did so in a way indicating that the blade was parallel to him.  Response to

PPFOF 142.  This dispute is not material.)  Pero held the knife with a white-knuckle grip

and was facing the deputy, with about eight feet between them.  Mrdjenovich commanded

Pero to "stop right now or I'll shoot you."

Other than statements from neighbors who say they did not hear any shouting before they heard gunshots, plaintiff does not have any evidence to dispute Mrdjenovich's account up to this point. However, the parties dispute what happened next. According to Mrdjenovich, while Pero was holding the knife in this hip-high, horizontal position, he took a quick, one-step lunge or "exaggerated step" towards Mrdjenovich, with his upper body leaning slightly forward. (Although plaintiff says that the court should disregard the statement in Mrdjenovich's affidavit that Pero was leaning forward or bent at the waist when he lunged because Mrdjenovich did not say this at his deposition, no one asked Mrdjenovich to describe Pero's upper body positioning. Mrdjenovich did say that he and Pero were facing each other "chest to chest" at the time he fired his weapon, but he did so in response to a question about how the parties were facing, not how they were standing. Mrdjenovich Dep., dkt. #54, 253:19-25. Moreover, although it is not in the record, Mrdjenovich demonstrated at his videotaped deposition what this lunging step looked like, Mrdjenovich Dep., dkt. #54, 257:2-11. Plaintiff has not suggested that Mrdjenovich was not leaning forward during this demonstration.) When Pero lunged, Mrdjenovich stopped his backpedal and fired his weapon from a triangle pose, with his gun at shoulder height, arms fully extended, with both hands on the gun.

Mrjdenovich knew his first shot had struck Pero, but Pero did not react at all. Mrjdenovich continued to shout at Pero to drop the knife, but he did not comply. Instead, he lunged at the deputy a second time. Mrdjenovich testified that Pero's body was in the

same lunging position for the second shot as it had been for the first shot, and that the two remained facing each other chest to chest, except that Pero was one step closer to him.

The deputy fired a second gunshot from the same location, using the same triangle pose, again striking Pero.  According to Mrdjenovich, Pero did not fall right away, but remained standing for a time frame that the deputy estimated was not less than 10 seconds but not more than 30 seconds.  During that interval, Pero stated "I just wanted to die," then stumbled forward and fell to the ground, tossing the knife out to his left side as he fell.  Pero fell face forward, hit the ground with his lower stomach first, then rolled forward onto his upper chest in a rocking motion, before lying flat.  When he fell, his left arm was underneath his body.

Mrdjenovich estimated that only 2-3 seconds elapsed between the shots, but that he had enough time in this interval to reassess the situation and determine that his first shot had not stopped the threat.  (A neighbor who heard the shots estimated a five-second interval between shots.)

It is undisputed that at 11:48:55 a.m., Mrdjenovich called over the radio: "627, shots fired, shots fired.  He wouldn't drop the knife.  Came at me.  Two shots fired, I need EMS now."  Backup officers and EMS officers arrived shortly after the dispatch.  Pero died from his injuries.  An investigation later discovered a suicide note written in Pero's handwriting.

Dr. Vincent Trachinda, Chief Medical Examiner for Dane County, Wisconsin, performed an autopsy of Jason's body.  His findings also are not in dispute.  The autopsy confirmed that Pero suffered two gunshot wounds to the chest, which Dr. Trachinda

arbitrarily labeled as "A" and "B." The bullet that caused wound "A" entered Pero's body in the right upper chest, and the bullet followed a directional path that was front to back, right to left and downward. This bullet struck Pero's heart, diaphragm and other internal organs. The bullet that caused Wound "B" entered Pero's body in the left lower chest, and like Wound A, followed a directional path that was front to back, right to left and downward. This bullet perforated Pero's gut lining, left kidney and left psoas muscle.

Plaintiff disputes that Pero lunged at Mrdjenovich at all, much less two times, and disputes other aspects of Mrdjenovich's account as well. In support, it relies primarily on testimony by Dr. Larry Blum. I address Dr. Blum's opinions and their admissibility below.

## OPINION

### A.  Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in

a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). To withstand a properly supported motion for summary judgment, plaintiff "must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing that there is a genuine issue for trial." Singer v. Raemisch, 593 F.3d 529, 533 (7th Cir. 2010). "[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 256–67. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Where, as in this case, the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense "may be made only with particular care." Plakas v. Drinski, 19 F.3d 1143, 1147 (7th Cir. 1994). In such cases, the court "must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." Id. Still, the burden rests on the plaintiff to establish triable issues for the jury, and "if there are sufficient undisputed material facts to establish that the officer acted reasonably under the circumstances, then the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's actions." Dawson v. Brown, 803 F.3d 829, 833 (7th Cir. 2015); Scott, 550 U.S. at 381 n.8 (once court determines relevant facts and draws all inferences in favor of the nonmoving party "to

the extent supportable by the record," reasonableness of officer's actions is "pure question of law").

## B.  Law Governing Excessive Force

Plaintiff asserts a claim against Mrdjenovich individually under 42 U.S.C. § 1983 for a violation of Pero's Fourth Amendment rights. Section 1983 authorizes private suits to redress deprivations of constitutional rights by state actors.  The Fourth Amendment assures the right to be free from unreasonable "seizures," a category that includes a law enforcement officer's use of deadly force against a free citizen.  Tennessee v. Garner, 471 U.S. 1, 7 (1985); Scott v. Edinburg, 346 F.3d 752, 756 (7th Cir. 2003) ("A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable.").

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Garner, 471 U.S. at 8).  In assessing whether an officer used excessive force, courts consider the totality of the circumstances and analyze the actions of the officer objectively, from "'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Weinmann v. McClone, 787 F.3d 444, 448-49 (7th Cir. 2015) (quoting Plumhoff v. Rickard, 572 U.S. 765, 775 (2014)).  Courts must also "'allow for the fact that

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Weinmann, 787 F.3d at 449 (quoting Plumhoff, 572 U.S. at 775).

"When addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the [person] poses an immediate threat to the safety of the officers or others." King v. Hendricks Cty. Commissioners, 954 F.3d 981, 985 (7th Cir. 2020) (quoting Sanzone v. Gray, 884 F.3d 736, 740 (7th Cir. 2018)). If the person of interest threatens the officer with a weapon, deadly force may be used, because at that point, the risk of serious physical harm to the officer has been shown. Id. This is so even if a less deadly alternative is available to the officer. Horton v. Pobjecky, 883 F.3d 941, 950 (7th Cir. 2018); Plakas, 19 F.3d at 1149.

The facts of King, 954 F.3d 981, are instructive. In that case, two deputies went to a man's home to perform a "welfare check." Id. at 983. The man came out of his house, walked toward the deputies, and pulled a 10-inch knife out of his shorts pocket. Id. The deputies backpedaled, drew their firearms, and yelled at him to drop the knife. Id. The man did not comply, but raised the knife in his left hand and started moving toward one deputy. Id. When he came within about eight feet from the deputy, the deputy fired one gunshot, which ultimately proved fatal. Id. The Seventh Circuit affirmed the district court's conclusion, reached at summary judgment, that the deputy's use of deadly force was constitutionally reasonable. Id. at 987.

As <u>King</u> makes clear, if after taking all reasonable inference in plaintiff's favor, the court accepts  Mrdjenovich's account of the critical events – that is, that Pero came toward him clenching a knife held at hip level, disregarded his repeated commands to stop and drop the knife, and then lunged at him – then the deputy's use of deadly force was constitutionally reasonable.  <u>See also</u> <u>DuLuna v. City of Rockford, Ill.</u>, 447 F.3d 1008, 1011 (7th Cir. 2006) (officer acted reasonably in using lethal force against man with history of violence who was acting irrationally, disregarded officer's commands to stop advancing as officer backpedaled, and who lunged at officer as officer was stumbling in a hole).

This is so even if this tragic incident might have been avoided had Deputy Mrdjenovich done things differently.  For example, plaintiff argues repeatedly and at length that Mrdjenovich should have just remained in his squad car and observed Pero until backup officers arrived, rather than stepping out of his vehicle and engaging with him, or at least should have kept his gun holstered, and that by failing to do so, he not only acted contrary to his training but "unreasonably created a situation where deadly force became essentially inevitable."  Br. in Opp., dkt. #74, at 23-33.  This argument is not supported by any reasonable view of the facts or the law.  As defendants point out, Mrdjenovich was legally authorized to approach Pero and ask him questions.  <u>United States v. Drayton</u>, 536 U.S. 194, 200-201 (2002) (law enforcement officers do not violate Fourth Amendment prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them).  Further, although stepping out of his vehicle with his gun drawn (but held down at his thigh) may seem heavy-handed, the fact

that he had been told the suspect had a knife and the caller had locked himself inside the residence provided reasonable suspicion to believe the subject was armed and potentially dangerous, a fact that was confirmed shortly after he called out to him.  United States v. Hensley, 469 U.S. 221, 235 (1985) (police officers were "well within the permissible range in the context of suspects who are reported to be armed and dangerous" in approaching, with their guns drawn, a vehicle they had stopped); United States v. Serna–Barreto, 842 F.2d 965, 968 (7th Cir. 1988) (officers' drawing of guns did not automatically escalate investigatory stop into an arrest where officers' safety required such a measure).  Moreover, Mrdjenovich did not point his weapon at Pero until Pero came towards him in defiance of the deputy's commands.

Critically, there is no evidence that Mrdjenovich's having his gun down at his side when he initiated contact with Pero provoked Pero, frightened him, or otherwise caused him to quickly traverse the yard toward the uniformed deputy, ignore his repeated commands to drop the knife, and continue advancing even after being warned that he would be shot if he did so, much less that Mrdjenovich had any reason to suspect that Pero would react in this erratic manner.  On these facts, no reasonable jury could conclude that Mrdjenovich's actions unreasonably created a deadly force situation.  Cf. Sledd v. Lindsay, 102 F.3d 282, 288 (7th Cir. 1996) (police created situation unreasonably necessitating use of force when they executed a late-night, no-knock search warrant in plain clothes and failed to announce their identities, causing homeowner to grab a rifle because he believed they were intruders); Estate of Starks v. Enyart, 5 F.3d 230, 232 (7th Cir. 1993) (reversing grant of qualified

14

immunity to officers who shot fleeing suspect as he drove vehicle towards officer, where plaintiff presented evidence showing that the officer placed himself in imminently threatening situation when he jumped in front of suspect's accelerating vehicle).  This is not to say that an officer's pre-seizure conduct is never relevant to the reasonable force inquiry, see, e.g., Deering v. Reich, 183 F.3d 645 (7th Cir. 1999), only that plaintiff has not identified any relevant circumstances in this case.  See Plakas, 19 F.3d 1143 (affirming summary judgment dismissing claim of excessive force by estate against officer who fatally shot deceased as he was about to strike officer with a poker); Tom v. Voida, 963 F.2d 952, 962 (7th Cir. 1992) (proper focus of excessive force inquiry was on time period when officer decided to use deadly force, not when she initiated contact with decedent); Estate of Brown v. Thomas, 7 F. Supp. 3d 906, 909 (E.D. Wis.), aff'd, 771 F.3d 1001 (7th Cir. 2014) ("[I]n this case the fact that Brown was pointing a gun at [the officer] *was* the totality of the circumstances, as far as the use of force was concerned.").

Finally, although Pero's young age of 14 makes this case especially disturbing, it is irrelevant for the purposes of this analysis.  Mrdjenovich testified that he estimated the suspect's age to be between 16 and 18.  Plaintiff argues that Mrdjenovich "should have known" Pero was a child, but it is undisputed that Pero's hood was up during the brief encounter.  Moreover, Pero's actual age was belied by the fact that he  was larger than many men, standing 5' 7" and weighing 356 pounds.  Finally, none of the authorities cited by plaintiff suggest that Pero's age, which was unknown to Mrdjenovich, is a factor that must

15

be weighted heavily, much less considered, when analyzing the use of deadly force in this case.  See Plt.'s Opp. to Def.'s Mot. for SJ, dkt. #74, at 18-20.

Under controlling legal standards, then, Mrdjenovich did not violate Pero's constitutional rights by employing deadly force if his account of what happened is true.  If Pero advanced towards Mrdjenovich with a knife after repeated commands to stop and drop it, then Mrdjenovich faced an imminent risk of serious harm that could be met with deadly force.  The sole question this court must decide, therefore, is whether plaintiff has adduced sufficient evidence from which the jury can reject Mrdjenovich's testimony that Pero lunged at him with the knife before both shots.  This requires an examination of the two separate gunshots, because even if Mrdjenovich was justified in shooting Pero the first time, "that does not necessarily mean he may still constitutionally use deadly force the next moment."  Horton v. Pobjecky, 883 F.3d 941, 950 (7th Cir. 2018).  See also Est. of Heenan ex rel. Heenan v. City of Madison, 111 F. Supp. 3d 929, 945 (W.D. Wis. 2015) ("Even if Heimsness's use of deadly force may have been reasonable at some point during his encounter with Heenan, it does not mean it remained reasonable, at least where circumstances have substantially changed.")(citation omitted).

Plaintiff argues that a reasonable jury could find that Pero did not lunge at Mrdjenovich even once, much less a second time after he had already been shot.  It further argues that a jury could find that he discarded the knife and uttered the words "I just wanted to die" *before* Mrdjenovich fired the second shot.  As noted above, plaintiff's case relies primarily on the opinions of its expert, Dr. Blum.

C. <u>Admissibility of Dr. Blum's Opinions</u>

Blum is a board-certified forensic pathologist, now retired, who performed autopsies for various counties throughout Illinois and Iowa for 30 years.  During his career, Blum performed more than 12,000 autopsies, including 1,500 in which the cause of death was a gunshot wound.  He has been qualified as an expert in forensic pathology by courts 616 times, with the vast majority of these cases being criminal.  In at least five cases, he offered opinions as to the location of the shooter relative to the victim, but he could not recall a case in which he offered testimony about the sequence of gunshot wounds through a torso.

Blum filed a report in which he offered the following opinions:

(1) the wound to Pero's lower left chest (the kidney wound) was caused by the first bullet and the wound to the right upper torso (the heart wound) was caused by the second;

(2) upon being struck in the kidney, Pero would have reflexively bent at the waist, rotated his body to the left, and begun falling to the ground, making it "improbable" that he could have lunged at Mrdjenovich or otherwise presented a threat after being shot the first time;

(3) Mrdjenovich shot Pero the second time while he was in this "flexed and rotated position;"

(4) the heart shot would have "immediately downed" Pero, making it "highly improbable" that he would have been able to stay upright for 10-30 seconds and "highly unlikely" that he could have said "I just wanted to die," as recounted by Mrdjenovich; and

(5) the fact that Pero's left arm was beneath his body after he collapsed made it likely that he had tossed or dropped the knife *before* the second shot.

Expert Report of Larry Blum, dkt. # 32-1.  (Blum also offered opinions about Pero's intent, the implications of the medical examiner's discovery of an arachnoid cyst in Pero's brain,

and the survivability of the kidney wound, but none of these opinions is material to deciding the summary judgment motion.  Accordingly, I have not ruled on their admissibility.)

Plaintiff offers Blum's opinions to show two things.  First, that *after* Mrdjenovich shot him the first time, Pero did not "lunge" or otherwise pose an imminent threat to the deputy's safety, and therefore it was objectively unreasonable for Mrdjenovich to shoot him a second time.  Second, even though Blum did not offer any opinion suggesting that Pero could not have lunged at Mrdjenovich *before* the first shot, plaintiff argues that Blum's interpretation of the autopsy findings undermines Mrdjenovich's testimony that Pero "made two identical lunges" towards him before he fired each gunshot, and therefore the jury could reasonably conclude that Mrdjenovich's account is fabricated and that Pero did not lunge at all.  Plt.'s Response to Defs.' PFOF, dkt. #73, 146.  Defendants have moved to exclude Blum's testimony under Fed R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

In Daubert, the Supreme Court interpreted Rule 702 to require "the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand."  Krik v. Exxon Mobil Corp., 870 F.3d 669, 674 (7th Cir. 2017) (citing Daubert, 509 U.S. at 589).  Before admitting expert testimony, the court must evaluate three things:  (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony.  Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017).  In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the

expert's conclusions," <u>Schultz v. Akzo Nobel Paints, LLC</u>, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," <u>Daubert</u>, 509 U.S. at 595. The "soundness of the factual underpinnings" and "correctness of the expert's conclusions" may affect any ultimate determination on the merits, but do not govern admissibility. <u>See</u> <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718–19 (7th Cir. 2000). The expert must explain his or her methodology and cannot "simply assert a bottom line." <u>Metavante Corp. v. Emigrant Sav. Bank</u>, 619 F.3d 748, 761 (7th Cir. 2010). District courts have "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." <u>United States v. Pansier</u>, 576 F.3d 726, 737 (7th Cir. 2009).

Defendants concede that Blum's testimony is relevant, but say that his opinions are unreliable. In addition, they argue that Blum is unqualified to testify as an expert on sequencing of gunshot wounds. As the proponent of Blum's testimony, plaintiff bears the burden of establishing its admissibility. <u>Gopalratnam</u>, 877 F.3d at 782.


1. <u>Qualifications</u>

As noted above, it is Blum's opinion that the shot to the kidney was first and the shot to the heart was second. Defendants argue that Blum is not qualified to offer this opinion because he acknowledged at his deposition that pathologists generally do not sequence gunshot wounds during an autopsy because they lack the information to draw those conclusions from the autopsy alone. Blum Dep., dkt. #32. As Blum went on to explain,

however, he did not arrive at his opinion merely by reviewing the autopsy findings: he also reviewed the investigative reports and Mrdjenovich's account of the shooting, as described at his deposition. Dr. Blum explained that in many of the 12,000 autopsies he conducted over his career, he worked closely with the detectives and crime scene investigators to analyze the preliminary evidence from the scene and the investigation. According to Dr. Blum, "virtually every case" he's worked on involves some sort of scene reconstruction, insofar as he must determine the time, manner and circumstances causing the decedent's death. According to Dr. Blum, his task as a forensic pathologist is to "interpret the scene in light of the autopsy findings and interpret the autopsy findings in light of the scene – a reciprocal action if you will," and he applied that same method in this case. Blum Dep., dkt. #32, 18:14-19.

As defendants acknowledge, an expert "may be qualified by knowledge, skill, experience, training, or education." Smith, 215 F.3d at 718 (internal quotation marks omitted). Although I agree with defendants that Dr. Blum may not necessarily be an expert on "sequencing of bullet wounds," his opinion on that topic was derived from a number of sub-opinions on other matters that defendants appear to concede *are* within his expertise as a forensic pathologist and physician. This includes the general trajectories of each bullet as it entered and traveled through Pero's body, the consistency of those trajectories with crime scene information, and the purported effects that the bullet wounds would have on Pero given the anatomical damage they caused. Accordingly, I find Blum qualified to offer his

opinions in this case, including his opinion that Pero sustained the kidney wound before the heart wound.

## 2. Reliability

Just because an expert may be qualified to render an opinion does not mean his opinion is admissible. Before admitting expert testimony, the court must determine that the expert's testimony is based on sufficient facts or data and is the product of reliable principles and methods, and that the expert reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. When evaluating the reliability of a proffered expert's testimony, courts should consider the following non-exhaustive list of factors:

> (1) whether the proffered theory can be and has been tested;
>
> (2) whether the theory has been subjected to peer review;
>
> (3) whether the theory has been evaluated in light of potential rates of error;
>
> (4) whether the theory has been accepted in the relevant scientific community;
>
> (5) whether maintenance standards and controls exist;
>
> (6) whether the testimony relates to matters growing naturally and directly out of research the expert has conducted independent of the litigation, or developed expressly for purposes of testifying;
>
> (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
>
> (8) whether the expert has adequately accounted for obvious alternative explanations;

21

(9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and

(10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Gopalratnam, 877 F.3d at 779–80 (internal citations and quotations omitted).   The reliability inquiry is flexible, however, and not all of these factors will apply in every case. Id. at 780; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). Although an expert may base his opinions on his experience, he must nevertheless explain how the application of his prior experience to the facts of the case compels his conclusion. See Fed. R. Evid. 702 Advisory Committee Notes ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply "taking the expert's word for it.")

### a.  Sequencing of bullet wounds and positioning of Mrdjenovich and Pero

Defendants move to exclude Dr. Blum from offering opinions regarding the sequencing of the gunshot wounds, the location or positioning of Mrdjenovich during the shooting, and the location or positioning of Pero's body during and immediately after the shooting.  They contend that none of his opinions on these matters are based on sufficient

facts or data or a reliable methodology and that plaintiff cannot show that the opinions result from any reliable application of that method.

From his review of the autopsy findings documenting where the bullets entered and ultimately came to rest in Pero's body, Blum determined that the two bullets traveled through Pero's body along different trajectories.  Blum did not perform any calculations or determine the precise angle of each bullet path through Pero's body. However, he determined, in general terms, that the path of the shot that ruptured the kidney was relatively parallel to the ground, "like a lake bed," while the shot that ruptured the heart was "markedly vertical," like a "mountain."  Blum Dep., dkt. #32, at 47-49, 57.  Dr. Blum's opinion as to the differences in the wound paths is foundational to his opinions regarding the relative positioning of Mrdjenovich and Pero when the shots were fired, and to his interrelated conclusion about the wound sequence.

At his deposition, Blum explained that, assuming the bullet did not ricochet, two variables determine a bullet's path through the body:  (1) the position of the gun; and (2) the position of the body that was hit by the bullet.  Id. at 67:6-8.  Blum asserted that, because Mrdjenovich said he did not change positions before he fired his second shot, the only variable that could have changed between the first and second shots was the position of Pero's body.  Id. at 78:8-14.  Blum explained that the relatively flat path of the kidney shot was consistent with Pero's standing upright at the time the first bullet struck him, explaining that this correlated with Mrdjenovich's testimony that when he shot Pero the first time, the two were standing "face to face" or "chest to chest," and the deputy was holding

his gun with two hands in a triangle pose, level with the ground. Id. at 73: 16-24.  However, it was Blum's opinion that the steeper trajectory of the heart shot – which Blum deemed to be the second shot – did not correspond with Mrdjenovich's testimony that Pero lunged at him with a knife in his left hand; rather, it suggested that Pero was rotated the opposite way one would expect if he was lunging with a knife in his left hand. Id. at 78:3-16.  Blum concluded that the change in Pero's body position necessary to produce the steep trajectory of the heart shot was instead the result of Pero's being struck in the kidney and then reflexively bending at the waist and rotating his body to the left, thus placing his chest in a position to receive the fatal heart shot. Id. at 78:14-79:8.  Further, it was Blum's opinion that, after Pero doubled over, his weight and momentum would have caused him to begin to fall to the ground, thus placing him in a lower position consistent with the angle of the heart shot. Id. at 90:22-91:9.

Asked to explain how he arrived at these conclusions, Dr. Blum said he examined the "entire picture" as presented by the autopsy findings, the crime scene evidence, and the deposition testimony and ran through various scenarios in his mind to find a theory that best accounted for all the various pieces of evidence, taking into account Pero's wounds and the  effect those would have had on him. Id. at 82:10-16.  For example, explaining his rationale for determining the shot sequence and positioning of Pero after the first shot, Blum testified:

> If not for the painful kidney shot, I can't think of a reason he would bend over
> and go into that position before the second shot.  And since getting shot in the
> kidney, there can cause a reflex option that can cause you to change your

posture.  That's what – where it led me.  That's why I came up with that scenario.

Id. at 89:19-24.  Blum admitted, however, that he had no evidence to support his opinion that Pero was doubled over in pain when he was shot the second time, apart from the fact that it "would explain the evidence if he did."  Id. at 90:16-21.

Blum further explained that his conclusion that the kidney shot preceded the heart shot was based on his opinion that Pero would not have had time in the 2-5 seconds between shots to receive a bullet wound to the heart (in the bent and rotated position), then stand back up and receive the kidney wound.  Id.  In addition, he said the blunt force injuries to Pero's hands, knees, and chin documented in the autopsy were consistent with his collapsing to the road, rather than "dropping" from a standing posture, as he would have if the heart wound was first.  Id. at 82:22-83:5.  Thus, Blum's opinions about Pero's movements and his opinion about wound sequence were mutually reinforcing, and were informed by his opinions about the effect that each wound would have on Pero's body.

Plaintiff has failed to demonstrate that Blum's methodology – analyzing pieces of evidence and superimposing a narrative of events that "fits" – is a reliable method of arriving at the specific conclusions he draws in this case as to the sequence of the gunshot wounds and the locations of Pero and Mrdjenovich during the shooting.  Dasho v. City of Federal Way, 101 F. Supp. 3d 1025, 1028 (W.D. Wash. 2015) (excluding similar expert testimony for same reason and finding it "doubtful whether forensic scientists can reliably establish shot sequence based on the type of evidence available here").  Although plaintiff correctly notes that the facts in this case are not nearly as complicated as those in Dasho, which

involved two officers firing 13 shots in quick succession at a rapidly moving person, 101 F. Supp. 3d at 1033, Blum's opinions are lacking the same indicia of reliability as the expert's wound sequencing opinion did in that case, insofar as plaintiff "cites to no treatises on this subject, no scholarly articles, no professional publications, no opinions of other experts in the field, and no cases in which federal courts have accepted a similar methodology as a basis for these types of opinions." Id. at 1032.  Nor has Blum shown that his method of reconstructing a crime scene – including the precise movements of a deceased victim as and after he was shot – is one that is typically performed in the field of forensic science and known to produce reliable results.  Id.

Apart from this, Blum's testimony reveals that he did not merely evaluate all of the available information in the case to determine what happened, but he contrived his own factual record to support his opinions, assuming, for example, that Pero would have reflexively doubled over in pain after being shot in the kidney.  As an expert, Blum cannot create his own factual record to support his opinions.  Rink v. Cheminova, Inc., 400 F.3d 1286, 1293 (11th Cir. 2005) (in evaluating the reliability of an expert's method, courts may properly consider whether expert's methodology has been contrived to reach a particular result).  Moreover, as discussed below, some of his predicate opinions about the effects that the gunshot wounds would have on Pero's ability to perform certain bodily activities rest merely on his own *ipse dixit* and are themselves unreliable.

Blum also failed to account for alternative explanations that could account for the relative differences in the angles of the wound paths other than Pero's reflexively bending

at the waist and rotating his body to the left, such as a slight change in Mrdjenovich's arms or hands, a change in the distance between Mrdjenovich and Pero when the shots were fired, or the possibility that one or both of them were not standing entirely erect at the time the shots were fired.  Unlike plaintiff, I am not persuaded that Mrdjenovich's testimony that he fired from the same spot and position both times eliminated any need for Blum to consider these possibilities.  Although the deputy's testimony substantially reduces the number of variables that could explain the difference in the wound paths, Blum's testimony nevertheless assumed a degree of precision not supported by that testimony and fails to account for the fact that the two shots were fired only seconds apart in a rapidly-evolving and tense confrontation.  Under these circumstances, common sense suggests that it is unlikely that the muzzle of Mrdjenovich's gun remained in "exactly" the same position for both shots; add that to all the other unknowns, such as how far apart he and Pero were standing, and the foundation for Blum's opinion crumbles.

It is true that because of their training and expertise, forensic pathologists are sometimes permitted to offer their opinions as to whether autopsy evidence is consistent with a certain position.  See, e.g., Deering, 183 F.3d at 654 (district court did not abuse its discretion in admitting forensic pathologist's testimony that "the wound was consistent with a certain position," noting that pathologist "has been involved in autopsies on at least 75 bodies that have been subjected to bullet wounds"); Rios v. City of Chicago, 523 F. Supp. 3d 1020, 1024 (N.D. Ill. 2021) (denying summary judgment, in part, based on expert testimony that victim's wound paths were inconsistent with officer's description of the chase

and how he fired when victim turned his body).  In this case, however, Blum's "position" opinions, although founded in part on the autopsy evidence, are inseparable from his unreliable and speculative opinions about the wound sequence.  In short, Blum's opinions on positioning and shot sequencing rest on too many logical leaps of faith to be reliable.

b.  Ability to lunge after kidney shot

As noted above, Dr. Blum offers the opinion that the first bullet wound (which Blum says was the kidney wound) would have caused an "immediate painful reflex action" that would have caused Pero to double over in pain.  Blum Rep., dkt. #32-1, p.6.  He added that this wound would "have caused [Pero] to begin to collapse to the pavement and would have made it improbable that Pero could have lunged at the officer."  Id.  At his deposition, Blum admitted that his opinion that Pero could not have lunged at the officer after the first shot was based on his opinion that Pero was falling to the ground, and not simply bent over.  Blum Dep., dkt. # 32, at 94:20-95:2.  However, he acknowledged that Pero could simply have been bent over and not fallen to the ground.  Id., 93:16-18.  Blum further acknowledged that Pero could have lunged at the officer even if he were bent over.  Id., 94:1-19.  In fact, Blum acknowledged that he had not considered the possibility that Pero was simply bent over and lunged forward from that position.  Id.

Defendants say that Blum's opinion regarding Pero's purported inability to lunge at Mrdjenovich after the first shot is inadmissible because it is premised on an assumption that is not supported by any factual evidence, namely, that Pero was falling to the ground after

28

the first shot.  Plaintiff does not respond directly to this argument, but says only that Blum's opinions with respect to the effect of a gunshot wound on the human body "are well within the scope of the expertise of a physician and experienced forensic pathologist such as Dr. Blum."  Br. in Opp., dkt. # 72, at 43.  However, plaintiff does not explain *how* Dr. Blum's expertise informed his opinion that, not only would Pero have reacted reflexively to the kidney shot, but that he would have begun to fall over.  In fact, rather than an opinion drawn from expertise, Dr. Blum's opinion that Pero was falling over after the first shot seems to be another fact contrived to support his overall narrative of how the encounter transpired. As such it is unreliable and inadmissible.

### c. Ability to stand after the heart shot

Dr. Blum offers a number of opinions about Pero's ability to perform certain activities after he was shot in the heart.  First, he says that "the heart shot would likely have immediately downed Jason and that it would have been highly improbable for Jason to remain standing for more than a few seconds, much less 10 to 30 seconds."  Blum Report, dkt. #32-1, p. 7.  When questioned how he arrived at this opinion, Blum said he "tri[ed] to look at all the facts in the case and see what was more probable than not."  Blum Dep., dkt. # 32, 116:14-17.  Defendants argue that this amounts to an admission that Blum lacked any reliable foundation for his opinion.

I agree.  As an initial observation, Dr. Blum's opinion is internally inconsistent insofar as he states that the heart wound would have "immediately downed" Pero, but in the same

29

sentence acknowledges that Pero could have remained standing for a few seconds.  Second, although plaintiff insists that Dr. Blum's opinion as to Pero's ability to remain standing for "no more than a few seconds" reflects that the doctor applied his education, training, and experience as a forensic pathologist and physician to the "obvious known facts" of the severity of the heart wound, Dr. Blum did not explain *how* that training, education, and experience informed his opinion.  As defendants point out, Blum's opinion is "exceedingly specific" in that he admits that Pero could have remained standing for "a few seconds" but not as many as 10.  Yet plaintiff cites no treatises, scholarly articles, or professional publications supporting Blum's very specific opinion, and he offered nothing from his own experience that informed his conclusion.  The mere fact that he is a "highly qualified physician" is not enough.

Finally, plaintiff suggests that Blum's opinion is reliable because it comports with "common sense," but it is not at all within the common experience of jurors to know how long a person could remain standing (or perform other activities) after going into cardiac arrest as a result of a gunshot wound to the chest, much less that it is likely only 3-10 seconds, as Blum opines. Plaintiff needs expert testimony to establish this fact.  Dr. Blum's wholly unsubstantiated opinion is inadmissible.  United States v. Noel, 581 F .3d 409, 497 (7th Cir. 2009) ("an expert's opinion that lacks proper substantiation is 'worthless'") (citing Minasian v. Standard Chtd. Bank, 109 F.3d 1212, 1216 (7th Cir. 1997)); Jones v. Lincoln Elec. Co., 188 F.3d 709, 724 (7th Cir. 1999) (expert's opinion assists the jury only to the

extent the expert draws on some special skill, knowledge, or experience to formulate the opinion).

### d.  Ability to speak after the heart shot

Blum offers the opinion that "Following the second shot, it would have been highly unlikely for Pero to engage in premeditated speech (i.e. 'I just wanted to die.')."  Blum Report, dkt #32-1, p. 7.  At his deposition, Dr. Blum testified that there were no physical injuries such as damage to the spinal cord or vocal chords that would have prevented Pero from speaking.  Blum Dep., dkt. # 32, 117:11-17.  Rather, it was Blum's conclusion that, given the wound to the heart, it was "unlikely" that someone would do anything other than groan and it was "more probable than not he didn't," particularly given that – in his imaginary view of the facts – Pero had already been doubled over from the kidney shot.  Id. at 117:4-10.

Plaintiff fails to demonstrate that this opinion results from a reliable methodology, reliably applied to the facts of this case.  Plaintiff once again argues that the "devastating nature of the heart wound" as documented by the autopsy, combined with Dr. Blum's application of his expertise as a forensic pathologist to the evidence, suffices to demonstrate the reliability of his opinion.  Once again, however, to be reliable, Dr. Blum needed to explain how his expertise informed his conclusions.  His failure to do so renders his opinion inadmissible.

e. <u>Ability to throw the knife after the second shot</u>

Finally, it was Dr. Blum's opinion that, "Given the fact that the knife was held in the left hand and the left arm was beneath the victim's body after the collapse, it is likely that the knife was tossed aside or dropped prior to the second shot." Blum Report, dkt. #32-1, at p.7. At his deposition, Blum explained that he came to that conclusion simply because he didn't think it was likely that, after being shot twice and starting to fall to the ground, Pero would be able to throw the knife out to the left with his left hand and then bring his left arm back to where it ended up beneath his body as he collapsed to the pavement. Blum Dep., dkt. #32, 103:19-104:1. Blum acknowledged that he had no basis on which to conclude that it was not scientifically possible for Pero to have tossed the knife after the second shot before falling, but based it "more on . . . I don't know, common sense or probabilities than anything." <u>Id.</u>, 104:17-22. This is sheer speculation and is not admissible. In sum, because plaintiff has failed to establish that Dr. Blum's opinions in this case resulted from the application of methods or techniques known to produce reliable results, were based on sufficient facts or data, or were otherwise reliable, they must be excluded.


D. <u>Plaintiff's Remaining Evidence</u>

Absent Blum's testimony, plaintiff lacks sufficient evidence from which a reasonable jury could conclude that Pero did not lunge at Mrdjenovich with the knife prior to each gunshot. Plaintiff points to statements made by Mrdjenovich in the immediate aftermath

of the shooting in which he did not say that Pero "lunged" at him or otherwise initiated an attack as evidence from which a jury could find not only that Mrdjenovich is lying, but that he shot Pero both times simply because Pero would not drop the knife.  See Estate of Biegert by Biegert v. Molitor, 968 F.3d 693 (7th Cir. 2020) (emphasizing that "someone does not pose an immediate threat of serious harm solely because he is armed.").  However, these purported inconsistencies are too slight to raise more than a metaphysical doubt about Mrdjenovich's veracity.  Mrdjenovich was not being asked to provide a detailed, step-by-step narrative, and even in his brief, volunteered statements, he said that Pero had "come at him" or kept coming towards him in some fashion.  The fact that he did not use the term "lunge" in the immediate aftermath of the shooting is not enough to warrant a jury trial.

This leaves only the testimony of three neighbors who say they heard the gunshots but no shouting before or between them, which plaintiff argues calls into dispute Mrdjenovic's testimony that he issued multiple, loud commands to Pero to stop and drop the knife before shooting him.  Even assuming any of these witnesses was paying enough attention during those three minutes to have noticed shouting, this too is not enough to allow a rational trier of fact to decide against Mrdjenovich.  After all, plaintiff's theory is that Mrdjenovich *did* issue commands and shot Pero because he would not comply.  Moreover, it is simply not logical to suggest that a deputy dressed in full uniform faced with an advancing, non-responsive person wielding a knife would simply point his service weapon at the person and say nothing as he advanced.  Mrdjenovich may not have shouted as loudly or as often as he thinks he did, but no reasonable juror could conclude he stood there silently

as Pero advanced with a knife.

Jason Pero's family has suffered a great loss. But on this summary judgment record, a jury could not reasonably find that their loss resulted from an unconstitutional use of deadly force.  Defendant Deputy Mrdjenovich is therefore entitled to summary judgment on plaintiff's § 1983 claim.

ORDER

IT IS ORDERED that:

1. Defendants' motion to exclude the opinions of Dr. Larry Blum, dkt. # 33, is GRANTED in all material respects; and

2.  Defendants' motion for summary judgment, dkt. # 37, is GRANTED.  The clerk of court shall enter judgment for defendants and close this case.

Entered this 10th day of January, 2022.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

34